# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 21-0555V

| | |
|---|---|
| CLAUDIA LANGMAID,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: September 16, 2024 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Meghan Murphy, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 11, 2021, Claudia Langmaid filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left-sided shoulder injury related to vaccine administration ("SIRVA") in connection with an influenza ("flu") vaccine received on October 24, 2019. Petition (ECF No. 1); *see also* Amended Petition filed Sept. 6, 2022 (ECF No. 19). The parties dispute whether the "severity requirement" (an element of all Program claims) is met. For the reasons discussed below, I find that Petitioner likely suffered her left shoulder injury and its residual effects for more than six months. Accordingly,  Petitioner's Motion for a Ruling on the Record (ECF No. 32) is **GRANTED.**

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I also find that she has satisfied all other requirements for a compensable Table SIRVA injury, and she is thus entitled to compensation under the Vaccine Act.

## I.    Procedural History

Petitioner filed a signed statement as Ex. 1 (ECF No. 1-4),[3] and medical records as Exs. 3 – 10 (ECF Nos. 10, 16, 20), which were incorporated in a September 6, 2022, Amended Petition (ECF No. 19). The claim was assigned to the "Special Processing Unit" (OSM's adjudicatory system for expedited resolution) (ECF No. 13). Respondent was opposed to any exploration of settlement, however, and filed his Rule 4(c) Report, in which he challenged Petitioner's severity showing, on May 12, 2023 (ECF No. 29).

Both parties were afforded a final opportunity to file briefs and any additional evidence they wished to have considered in my adjudication of the duration of Petitioner's alleged injury. Scheduling Order filed May 17, 2023 (ECF No. 30); Petitioner's Ex. 11 and Motion for a Ruling on the Record filed July 6, 2023 (ECF Nos. 31, 32); Response filed Aug. 23, 2023 (ECF No. 33); Reply filed Sept. 7, 2023 (ECF No. 34). The matter is now ripe for adjudication.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which

---

[3] The statement was not notarized or signed under penalty of perjury as required by 28 U.S.C. § 1746.

are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A potential petitioner must demonstrate that he or she "suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i)[4]; *see also Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that

---

[4] Section 11(c)(1)(D) presents two alternative grounds for eligibility to compensation if a petitioner does not meet the six months threshold: (ii) death from the vaccine, and (iii) inpatient hospitalization and surgical intervention. Neither alternative is alleged or implicated in this claim.

a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Human Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

## III.   Evidence

I have reviewed all submitted evidence including all medical records and affidavits, as well as the Petition, the Rule 4(c) Report, and both parties' briefing. The following section focuses on the evidence most relevant to the disputed criterion (severity).

Petitioner was born in 1969. She saw an established primary care provider ("PCP") on an infrequent basis. *See, e.g.*, Ex. 4 at 11 – 12 (encounter summary). In January 2019, she was briefly evaluated for injuries to her right dominant shoulder, sustained while working as a horseback riding instructor. Ex. 5 at 19 – 22, 42, 85 – 93; *but see* Ex. 4 at 18 –28 (subsequent primary care records not referencing this injury).[5] The parties agree that Petitioner had no history of pain or dysfunction in her *left* shoulder, and that her medical history is "non-contributory." Response at 2.

On October 24, 2019, Petitioner received the at-issue flu vaccine in her left deltoid, at her PCP's office in Pennsylvania. Ex. 4 at 18 – 22; Ex. 9 at 2.

Six (6) days later (October 30, 2019), Petitioner returned to her PCP, with a chief complaint of left shoulder pain lasting for six days. Ex. 4 at 20. An exam found normal range of motion ("ROM"), normal strength, positive impingement tests, and tenderness on the lateral shoulder inferior of the lateral aspect of the acromion. *Id.* at 17. The PCP believed that "the flu shot was administered more superiorly than usual[…] just inferior to the lateral acromion, so I suspect may have irritated the subacromial bursa." *Id.* He initially recommended rest and NSAIDs. *Id.*

---

[5] *Accord* Rule 4(c) Report at 2; Response at 2 (stating that Petitioner had a "non-contributory medical history").

On November 5, 2019, Petitioner obtained an orthopedist's[6] initial evaluation of her post-vaccination left shoulder pain. Ex. 5 at 17. Her complaint was:

> Intermittent sharp anterior and lateral R shoulder pain since 10/24/19, shot got a flu shot that day and believes it was given higher than usual. Seemed to be improving, but then worsened again this weekend. – Swelling or redness, – popping, click, catching, grinding. Good ROM. Diff w/ raising arm to overhead, reaching behind back, carrying weight, lifting away from body, sleeping. No previous tx. Ibuprofen pm.

*Id.* An exam found good ROM, but positive impingement signs. *Id.* at 18. X-ray imaging was consistent with a type III acromion, mild osteoarthritis in the AC joint, and no glenohumeral joint ("GH") abnormalities. *Id.* The orthopedist's initial assessment was a left rotator cuff tendinopathy and bursitis. *Id.* He administered a subacromial steroid injection, and recommended rest and ice. *Id.*

At an orthopedics follow-up four weeks later, on December 3, 2019, Petitioner reported that the steroid injection had relieved her left shoulder pain for one week, then her pain worsened again. Ex. 5 at 15. The pain also seemed to improve with rest, but then worsens again with activity. *Id.* The pain was currently at the same level it was at the last visit. *Id.* The orthopedist ordered an MRI of the left shoulder. *Id.* The December 6, 2019, MRI report's conclusions were: "1. Large subacromial subdeltoid bursitis. 2. No evidence of osseous injury or rotator cuff abnormality. The rotator cuff tendons are intact. No muscle edema or atrophy." Ex. 7 at 21. Upon reviewing the MRI findings on December 10, 2019, the orthopedist changed his assessment to bursitis, for which he prescribed Vimovo. Ex. 5 at 12 – 13.[7]

Next, at a January 10, 2020, annual primary care appointment, Petitioner complained that her left shoulder injury was "not getting better" and she could not sleep on her left side. Ex. 4 at 13. The PCP recommended continuing NSAIDs and following up with her orthopedist. *Id.* at 14 – 15.

At the next orthopedics appointment on February 7, 2020, Petitioner complained that her left shoulder pain had not resolved despite taking ibuprofen and Vimovo. Ex. 5 at

---

[6] Petitioner had previously seen this orthopedist for her earlier right shoulder injury. *See, e.g.*, Ex. 5 at 21 – 22.

[7] Vimovo is an anti-inflammatory arthritis medication containing naproxen and esomepazole magnesium. Rule 4(c) Report at 5.

10. The orthopedist maintained the assessment of bursitis, administered a second steroid injection, and for the first time, discussed the potential of arthroscopic surgery. *Id.*[8]

On March 3, 2020, Petitioner reported that her left shoulder was improved after the most recent injection, but still painful with certain motions. Ex. 5 at 8. The orthopedist referred to a physical therapist ("PT") within his practice. *Id.* at 7, 9.

At the PT initial evaluation on March 9, 2020, Petitioner rated her left shoulder pain as currently at 1 – 2/10 but rising to 5/10 and even 8/10 "on occasion." Ex. 6 at 39. She recounted that since receiving a vaccination in her left shoulder that was "placed wrong" on October 24, 2019, she had been experiencing "bursitis that has been flaring on and off," despite two cortisone injections and rest. *Id.* at 39 – 40. She struggled with sleeping on the left side and using the left arm for activities including yoga and dog walking. *Id.* at 40. She also would "be *starting* a position *in the summer* working with horses." *Id.* (emphasis added). On exam, the left shoulder had decreased ROM (in active and passive flexion, abduction, external and internal rotation, and extension). *Id.* There was also slightly decreased strength, and scapular instability. *Id.* at 40 – 42. Skilled therapy was planned twice a week for six weeks. *Id.* at 42 – 43. With adherence to the formal PT sessions, it was expected that Petitioner would be able to transition to an independent fitness program, resume sleeping on her left side, and reach and lift with her left shoulder by April 20, 2020. *Id.*

However, Petitioner attended just one formal PT session on March 11, 2020. Ex. 6 at 38. She was "confident" performing home exercises, but she had ongoing limitations in ROM, strength, and scapular stability. *Id.* Then on March 18, 2020, the PT practice noted that Petitioner was "on hold due to Coronavirus." *Id.* at 37.

For the next fourteen (14) months, Petitioner did not see any medical provider regarding her left shoulder or any other subjects. But on September 26, 2020, she was recorded as receiving another flu vaccine in her at-issue left arm. Ex. 4 at 71 (CVS computerized record, contained within the PCP records).

---

[8] This February 7, 2020, appointment record provides that Petitioner also complained of "intermittent later L elbow pain recently." Ex. 5 at 10. However, the orthopedist did not examine, assess, or treat the elbow on that date. I did not find any other evidence to support that Petitioner's post-vaccination injury was not limited to the shoulder. Moreover, Respondent did not raise that argument. Accordingly, this complaint of elbow pain does not foreclose Petitioner from establishing a Table SIRVA claim (and it obviously cannot be included in any damages demand for the same). For the same reasons, Petitioner's complaint of acute left *knee* pain that was assessed as a lateral meniscus tear, *see* Ex. 5 at 8 – 11, is also distinguishable from the SIRVA claim.

Next on May 4, 2021, Petitioner returned to her same orthopedist, for reevaluation of her left shoulder. Ex. 6 at 10. She reported doing two PT sessions, then having to stop due to the Pandemic. *Id.* The pain was "improving but still bothersome… intermittent [and] deep," and associated with many of the same activities as before (e.g., reaching behind her back, carry weight, lifting away from her body). *Id.* She was still taking ibuprofen and naproxen as needed. *Id.* The orthopedist recorded similar exam findings, the same assessment of bursitis, and recommended returning to PT. *Id.* at 11.

At a May 14, 2021, reevaluation with the same physical therapist, Petitioner reported her left shoulder pain as currently at 3/10 and at worst 7/10. Ex. 6 at 13. She reported the injury had been present since the October 2019 vaccination, but she had not sought treatment during the Pandemic. *Id.* On exam, the left shoulder had normal flexion and abduction but painful, slightly decreased external and internal rotation. *Id.* at 14. There was also decreased strength, scapular instability, and decreased glenohumeral ("GH") joint capsule mobility. *Id.* at 14 – 15. Petitioner attended ten (10) formal PT sessions through June 11, 2021. *Id.* at 16 – 24.

A June 25, 2021, MRI of the left shoulder primarily found "minimal subacromial subdeltoid bursitis, decreased from the prior study." Ex. 7 at 8. There was also a "questionable small posterior labral tear, similar appearance to prior study," and a type II acromion. *Id.* The orthopedist opined that this "anterior lateral down sloping acromion [was] causing impingement," and Petitioner opted for surgical intervention. Ex. 7 at 6 – 7; *see also* Ex. 8 at 16 – 17.

On November 10, 2021, the orthopedist recorded the following indication for surgery: "Chronic left shoulder pain aggravated by lifting and reaching activities for the past several years. Because of continued pain, a repeat MRI was performed which did reveal a possible tear of the rotator cuff with significant bursitis as well as a down-sloping acromion causing impingement." Ex. 8 at 24. The orthopedist then performed an arthroscopic acromioplasty and rotator cuff debridement, which included visualization of "moderate" subacromial bursitis, and the resection of bursal tissue. *Id.* at 24 – 25. Petitioner was instructed to wear a sling and perform home exercises each day. *Id.* at 25.

By the first post-operative orthopedics evaluation on November 18, 2021, Petitioner's left shoulder pain and ROM were improving, and she was authorized to stop wearing the sling. Ex. 8 at 13 – 14. She reported receiving shingles and COVID-19 booster vaccines in her left arm, at the next orthopedics follow-up on December 14, 2021. *Id.* at 11 – 12. After attending 18 PT sessions between December 29, 2021, and March 17, 2022, Petitioner achieved good progress with her left shoulder ROM, strength, and

stability, and she was discharged with a HEP. *Id.* at 30. There are no further medical records in evidence.

I have reviewed Petitioner's October 6, 2020, email to an intake coordinator at her counsel's firm, which states in full: "I haven't seen him sinch March when he ordered the PT but I still haven't gone through full PT due to Covid. Should I try to do that first before I see the orthopedic doctor? PT gave me exercises for home back in the spring, but they haven't really helped." Ex. 11 at 1.

Finally, Petitioner states plainly and without elaboration that she has "suffered the residual effects or complications of these left shoulder injuries for more than six (6) months, which were caused in fact by the flu vaccine." Ex. 1 at ¶ 4. But her "understanding that [this statement] will be filed in connection with" her Vaccine Program petition, *id.*, which is not equivalent to a statement sworn under penalty of perjury, or an affidavit.

## IV.   Analysis

The only disputed issue is whether Petitioner's left shoulder injury documented shortly after the October 24, 2019, flu vaccine, and its residual effects, persisted for over six months. Section 11(c)(1)(D) (statutory six-month requirement).

Respondent's challenge to this requirement is not unreasonable, given the facts. Petitioner's injury was only documented for about four and one-half months post-vaccination, followed by a fourteen (14) month gap. Rule 4(c) Report at 7. And other than noting the fact that the gap began around the time of the start of the Pandemic (a time when many individuals were reasonably reluctant to seek non-emergency medical care)[9], Petitioner also has not submitted any case-specific non-medical evidence that might help to "fill in" this gap. Her later informal statements are entitled to less weight, and her briefing does not grapple with certain arguments raised by Respondent (e.g., the potential that Petitioner continued to work with horses, that she apparently received another vaccination in her allegedly injured left shoulder during the treatment gap, and that her post-gap injury appeared to be different). Therefore, Petitioner's additional submissions have not particularly helped my adjudication of the severity issue.

---

[9] The Pandemic has been repeatedly recognized in Program cases as a potentially valid explanation for treatment gaps, particularly those occurring in 2020 and early 2021. *See, e.g.*, *Miller v. Sec'y of Health & Hum. Servs.*, No. 20-1900V, 2023 WL 1468491 at *5 - 6 (Fed. Cl. Spec. Mstr. Sept. 29, 2022); *Kostka v. Sec'y of Health & Hum. Servs.*, No. 21-0418V, 2024 WL 2863526, at *4 – 5 (Fed. Cl. Spec. Mstr. May 2, 2024); *Gates v. Sec'y of Health & Hum. Servs.*, No. 21-0511V, 2024 WL 2874626, at *5 – 6 (Fed. Cl. Spec. Mstr. May 6, 2024); *Tompkins v. Sec'y of Health & Hum. Servs.*, No. 210513V, 2024 WL 3688494, at *5 (Fed. Cl. Spec. Mstr. June 28, 2024).

However, the above medical records reflect that Petitioner regularly sought treatment for left shoulder pain that was mild to moderate, and assessed primarily as bursitis. That injury was temporarily relieved by rest, over-the-counter and prescription NSAIDs, and two steroid injections that occurred on November 5, 2019, and February 7, 2020. The temporary relief from those measures is consistent with Petitioner's characterization that her bursitis flared on and off.

In addition, Petitioner's left shoulder pain, plus objectively reduced ROM, were documented for nearly five months post-vaccination. And by March 2020, it is not evident she had likely recovered. Thus, her orthopedist and physical therapist had recommended at least one month of skilled therapy to improve her condition. But her PT was instead put in hold, because of the Pandemic's emergence. Discontinuation of medical care does not necessarily mean an injury has resolved. Reply at 5, citing *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014). And although this case's 14-month treatment gap was lengthy, it was not inconsistent with the mild to moderate nature of the injury. Nor was the gap punctuated by medical treatment for any other complaints, or any evidence that Petitioner's left shoulder had actually recovered.

Respondent suggests a few things about what occurred during the gap that he deems relevant to severity. For example, he raises the possibility that Petitioner worked as a horseback riding instructor during the treatment gap (suggesting therefore that her shoulder pain was not limiting her activities). Response at 8, 9. But while Petitioner did not respond to this argument, the medical records reflect that Petitioner merely anticipated to *start* this job in the summer of 2020, Ex. 6 at 40. In addition, Respondent posits that Petitioner would not have received an additional flu vaccine in her left arm on September 26, 2020, if she had an ongoing left shoulder injury at that time. Response at 8. But Petitioner was also later documented as receiving vaccines in her left arm while she was still recovering from arthroscopic surgery. Ex. 8 at 11.

Overall, then, there is preponderant evidence within the medical records that Petitioner's post-vaccination left shoulder injury persisted for over six months and beyond, through to her arthroscopic surgery and post-operative PT. Whether Petitioner's issues *after* the lengthy gap are also related is far less clear. On the one hand, Petitioner – and her medical providers - consistently related all of her left shoulder symptoms back to the vaccine, without any indication of a full recovery, recurrence, or new injury.

In addition, Respondent's suggestion that Petitioner's description of the injury changed, *see* Response at 8, is not supported by my review of the records.[10] The 2021 records again reflect objective left shoulder pain and decreased ROM, and the same assessment of bursitis – which was remedied during the November 2021 surgery. And the contention that Petitioner's "MRI findings were substantially different, revealing an anatomical source of impingement per her orthopedist," flies against the fact that the "anatomical source" identified was the type II acromion, which would have been present throughout Petitioner's life, and does not likely represent a *new, intervening* factor that would prevents a severity determination in her favor.[11]

Nevertheless, the gap is substantial – and Petitioner's condition was not particularly severe as of February – March 2020. My finding of severity thus only deems that requirement met; I am not also finding it preponderantly established that *all* of Petitioner's complaints recorded after May 2021 are necessarily associated (although as noted some evidence supports that conclusion). Both parties must take this into account in considering damages to be awarded.

## Conclusion and Scheduling Order

Respondent has stated no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. She experienced pain within 48 hours of vaccination, and she exhibited pain and limitations in ROM solely in her left, injured shoulder. As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of his SIRVA for more than six months. *See* Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, she received a seasonal flu vaccine within the United States, *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). And there is no evidence that Petitioner has

---

[10] *Compare* Ex. 5 at 17 (November 2019 orthopedics record of "– popping, click, catching, grinding"); and Ex. 6 at 10 (May 2021 orthopedics record with the same notation). Moreover, the "–" seems to indicate the patient's *denial* of such symptoms. The case evidence over does not support that Ms. Langmaid's left shoulder ever displayed popping, clicking, catching, or grinding.

[11] The acromion is the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder. *Acromion*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=708&searchterm=acromion (last visited Sept. 13, 2024). *See also, e.g.*, *Stiller v. Sec'y of Hum. Servs.*, No. 20-1841V, 2023 WL 8539387 at * 9 – 11, and n. 6 (Fed. Cl. Spec. Mstr. Nov. 13, 2023) (in which Special Master Horner noted Respondent's argument that a Type II acromion "is an anatomic variant that increases the risk" of shoulder injuries, but nonetheless found that the Petitioner has established a Table SIRVA).

collected a civil award for her injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a left-sided SIRVA following administration of the flu vaccine on October 24, 2019.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Wednesday, October 16, 2024, Petitioner shall file a Status Report updating on the parties' efforts towards informally resolving damages.** The status report shall specifically state the date by which Petitioner provided, or intends to provide, a demand for damages to Respondent.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Petitioner previously reported that the case does not involve a workers' compensation claim or a Medicaid lien. Scheduling Order filed Aug. 8, 2022, at 1 (memorializing status conference).